E-FILED
Wednesday, 29 March, 2006  03:48:02 PM
Clerk, U.S. District Court, ILCD

```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF ILLINOIS

LINDA S. ABBOTT,              )
                              )
       Plaintiff,             )
                              )
  v.                          )     Case No. 04-4084
                              )
JO ANNE B. BARNHART,          )
Commissioner                  )
of Social Security,           )
                              )
       Defendant.             )
```

## ORDER

This matter is now before the Court on Plaintiff's Motion for Summary Judgment [Doc. # 8] and Defendant's Motion for Summary Affirmance [Doc. # 12]. For the reasons set forth below, Plaintiff's Motion for Summary Judgment [Doc. # 8] is DENIED and Defendant's Motion for Summary Affirmance [Doc. # 12] is GRANTED.

## BACKGROUND

Abbott, a 56-year old female, filed for Disability Insurance Benefits (DIB) in 2001 alleging a disability onset date of September 19, 2000 which she later amended to March 31, 2001. (R. at 18, 25.) Abbott alleged disability due to a broken wrist, the inability to use her right arm much, her ankles hurt so much that she could not stand, and her back hurt so that she had a hard time walking or standing. (R. at 20.)

The record reveals the following regarding Abbott's medical condition. In 1992, Abbott was diagnosed with pulmonary fibrosis and emphysema. (R. at 159.) A May 2000 chest x-ray revealed chronic obstructive pulmonary disease (COPD) and "[m]inimal

degenerative changes of the thoracic spine." (R. at 214.) In August and September 2000, Abbott saw Dr. Margaret Millar with complaints of pain in her hands, feet, back, and shoulder blades. (R. at 277.) X-rays of Abbott's hands showed no acute or significant findings for the left wrist, and a non-union fracture of the ulnar styloid in her right wrist. (R. at 211-12.) Abbott was referred to Thomas VonGillern, M.D., an orthopedist, who ordered a magnetic resonance imaging ("MRI") of Abbott's right wrist, which confirmed a cartilage tear, degenerative cysts, and a non-union fracture of the tip of the ulnar styloid. (R. at 262-63.) The MRI showed no other acute fracture or remarkable findings. (R. at 263.) A November 2000 bone densitometry study revealed that Abbott's bone density was low, and that she needed more calcium in her diet, and possible use of hormone therapy. (R. at 255-56.) On November 7, 2000, Dr. Millar opined that Abbott possibly had fibromyalgia. (R. at 274.) In December 2000, Dr. Millar noted Abbott had situational anxiety and a "tender back." She prescribed Paxil, Clonazepam, and Ultram. (R. at 272.)

Also in December 2000, Abbott underwent surgery to repair the torn ligament and ulnar impaction in her right wrist. (R. at 261.) On February 27, 2001, Dr. VonGillern indicated that Abbott needed to work on improving her range of motion and strength in her wrist. (R. at. 247.)

In March 2001, Dr. Millar, diagnosed Abbott with chronic back

pain and again prescribed Ultram and Elavil. (R. at 270.) In June 2001, Dr. Millar filled out an evaluation form regarding Abbott's functional limitations. Dr. Millar left most of this form blank; however, she indicated Abbott had pain in her wrist with repetitive motion, and that Abbott had reported chronic back pain. (R. at 280.) Dr. Millar also indicated that Abbott could ambulated normally, and could walk more than 50 feet without assistance. (R. at 280.)

On September 4, 2001, Abbott was examined by Kirk Witherspoon, a clinical psychologist. (R. at 299.) Abbott reported that she watched television, sewed "a little," and occasionally ate out; and that she did her own shopping, cooking, cleaning, and self-care, but that she did it "slow". (R. at 300.) She also reported that she had trouble sleeping without medication, that she had a limited appetite, that she had crying spells and occasional irritability, and that she had trouble trusting males. (R. at 300.) Dr. Witherspoon observed that Abbott was well oriented, had a fair attention span and ability to concentrate, had coherent speech, and was mood-congruent. (R. at 300.) Abbott seemed self-conscious, but had average intelligence and adequate social judgment. (R. at 301.) Dr. Witherspoon diagnosed Abbott with a major depressive disorder and an anxiety disorder. He estimated Abbott's GAF[1] at

---

[1] Global Assessment of Functioning is for reporting the clinician's judgment of the individual's overall level of functioning and carrying out activities of daily living. A score

40. He recommended "that Ms. Abbott be regarded as suffering from both marked medical and psychological difficulties relative to the question of her perceived capacity to seek or sustain employment." (R. at 301.)

On September 21, 2001, Jerrold Heinrich, Ph.D., a state agency psychologist, reviewed the record. (R. at 285-97.) Dr. Heinrich diagnosed Abbott with an affective disorder and an anxiety-related disorder that produced only a mild difficulty in maintaining concentration, persistence, or pace. (R. at 285, 295.) Dr. Heinrich concluded that Abbott was periodically anxious about employment and seeking a job, and that she occasionally had limited energy and difficulties with memory, but that these psychological limitations did not affect her daily functioning. (R. at 297.)

On September 20, 2001, Dr. Barry Free, a state medical consultant, reviewed Abbott's medical records. Dr. Free opined that Abbott could lift 20 pounds occasionally, 10 pounds frequently, and stand, sit, and walk for about 6 hours in an 8-hour day. (R. at 307.) He further found that Abbott was limited in her use of her upper extremities, but found no other limitations. (R. at 307-10.) Dr. Free concluded that Abbott had no manipulative

---

of 35-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relationships, judgment, thinking, or mood. See Diagnostic and Statistical Manual of Mental Disorders (DSM IV) Text Revision, American Psychiatric Association at pgs. 32-34(2000).

4

limitations subsequent to her wrist surgery, and no loss of motion in her involved joints. (R. at 313.) Dr. Free's findings were reviewed and affirmed by Dr. Paul Smalley. (R. at 313.)

In December 2001, a consultative physical examination was performed by Dr. Peter Biale. (R. at 302-05.) Abbott had full range of motion in all joints, although pain in the right ankle upon movement and in the left heel upon palpitation was noted. (R. at 304.) Although Abbott had difficulty squatting and performing heel-to-toe walking, she was able to bear full weight and walk normally. (R. at 304.) Abbott's finger grasp and hand grip strength were unimpaired in both hands, and she had full range of motion in her right wrist. (R. at 304.) Dr. Biale noted that Abbott had stopped taking anti-depressants "due to lack of funds." (R. at 305.)

In February 2002, Dr. Millar noted that Abbott complained of pain in the back, wrist, knee, and ankles; stiffness and tenderness in the knee; and difficulty breathing. (R. at 335.) Dr. Millar prescribed Naproxen and Ultram. (R. at 335.) In May 2002, Abbott continued to complain of joint and back pain. Dr. Millar diagnosed osteoporosis, fibromyalgia, anxiety, and nicotine addiction, and prescribed Estropipate, Prozac, and Ultram. (R. at 334.)

Also in May 2002, Dr. Millar filled out a "Multiple Impairments Questionnaire." (R. at 316-323.) In the questionnaire, Dr. Millar noted that Abbott had chronic back pain,

5

osteoporosis, osteoarthritis, and fibromyalgia, with a fair to good prognosis for recovery. To support her diagnosis, Dr. Millar cited clinical findings of multiple positive trigger points, positive bone scan for osteoporosis, and mild Heberden's nodes[2] on the hands. (R. at 316.) She opined that Abbott could sit for 6 hours a day with the option of moving around hourly, and that she could stand/walk for 2 hours in an 8-hour work day. (R. at 318.) Abbott could occasionally lift and carry up to 5 pounds, and was significantly limited in doing repetitive reaching, handling, fingering, and lifting because of her right wrist injury. (R. at 319.) Abbott was essentially precluded from grasping, turning, twisting, fine manipulation, or reaching overhead with her right hand. (R. at 320.) In regards to Abbott's left hand, Dr. Millar opined that Abbott was significantly limited in grasping, turning, twisting, fine manipulation, and reaching overhead. (R. at 319-20.)ABBOTT Dr. Millar also indicated that Abbott was capable of performing low-stress work (R. at 321), but was unable to push, pull, kneel, bend, or stoop (R. at 322). She indicated that Abbott's symptoms would likely increase if she were required to work, and she would likely be absent 2-3 times per month as a result of her impairments and treatment. (R. at 320-22.)

On June 18, 2002, Abbott complained of aches and pain "all

---

[2]Small bony growths found on the terminal phalanges of the fingers in osteoarthritis. See www.dictionary.com

over" and Dr. Millar noted that Abbott was unable to perform recommended exercises. (R. at 333.) Dr. Millar prescribed Amitriptyline and Darvocet. (R. at 333.) On July 11, 2002, Abbott complained that her eyes were "filming over," and that her fibromyalgia was acting up. (R. at 332.) On August 16, 2002, Abbott reported that her eyes were better but that her fibromyalgia was "still the same." Dr. Millar added Tramadol to Abbott's medications. (R. at 331.) On September 27, 2002, Abbott reported that her fibromyalgia symptoms worsened with cold weather. Upon examination, Dr. Millar noted mild swelling in Abbott's right ankle. She prescribed Proxican. (R. at 330.)

On November 8, 2002, Abbott reported symptoms of stiff knees and right wrist pain. Dr. Millar noted decreased sleep, irritability, premature osteoarthritis flare of the right wrist, and fibromyalgia. (R. at 329.) On January 3, 2003, Abbott reported that she "hurt all the time"; Dr. Millar refilled Abbott's Ultram prescription. Dr. Millar's treatment notes from February 2003 stated that Abbott "needs note to say unable to work, for state food stamps/ disability still pending." (R. at 328.) Dr. Millar's March 2003 notes showed that Abbott continued to complain of back, wrist, ankle, leg, and neck pain, which she diagnosed as fibromyalgia, osteoporosis, and wrist osteoarthritis. At that time Dr. Millar told Abbott to hold off on resistance training. (R. at 326.) In May 2003, Abbott present with occasional dyspnea, knee

7

pain, numbness in the hands causing dropping, anxiety and dizziness. Dr. Millar diagnosed severe right wrist arthritis and neuropathy with chronic pain, restless leg syndrome, mild anxiety, osteoporosis, and osteoarthritis.

At the May 19, 2003, administrative hearing, Abbott (who was represented by counsel) testified to the following. In her past work she lifted 10 to 45 pounds, and stood up to 8 hours, though sometimes with a sit-stand option. (R. at 48-50.) She claimed that currently, she could lift less than 5 pounds, walk a block, stand for 15 minutes, sit for 15-20 minutes, and needed to sit in a reclined position or lie down to relieve her pain. (R. at 56-57, 59.) Abbott said she had difficulty bending, stooping, crawling, kneeling, squatting, climbing, and gripping, and that she had difficulty understanding and remembering things, and handling stress or pressure. (R. at 70-73.) She testified that she took Ultram and Extra Strength Tylenol every four hours, and that it "[took] the edge off" her pain. (R. at 55.) She also testified that she had difficulty concentrating because of her pain. (R. at 58.) She admitted that her pain medications gave her no problems as long as she ate before taking them. (R. at 70.) Abbott no longer took Paxil for depression, and had changed to "lighter" medication. (R. at 58.) Abbott, who lived in an upstairs apartment, admitted she drove everyday to her daughter's house, supervised her 5-year old grandson during the day, attempted to

sew, did laundry, cleaned her house, vacuumed and swept, and went grocery shopping with the aid of her daughter. (R. at 45, 60-62.)

At the hearing, the Administrative Law Judge ("ALJ"), asked Jeff Johnson, the vocational expert, whether a hypothetical individual with the same vocational characteristics as Abbott could perform her past work, if that person were limited to lifting no more than 20 pounds but routinely lifting 10 pounds with no standing for more than one hour at a time, no sitting for more than one hour at a time, and no walking for more than one hour at a time; sitting for 6 hours and standing or walking for 4-6 hours in an 8-hour day; only occasional bending, stooping, squatting, kneeling, crawling, or climbing; no repetitive pushing, pulling, handling of objects, or overhead work; doing less than complex or technical work but more than simple, routine, repetitive work, which did not require constant and close attention to detail; and doing regularly paced work with no more than mild to moderate levels of stress, under occasional supervision. (R. at 79.)

In response, the vocational expert stated that such an individual could perform Abbott's past work as an electric sealing machine operator where Abbott was sitting most of the time and not lifting more than 20 pounds. (R. at 81.) The vocational expert further testified that Abbott had transferable skills from her past work, including records maintenance, which would allow her to perform work as a telephone solicitor, which required only

sedentary levels of exertion and included 1,000 jobs in the regional economy. (R. at 81.) The vocational expert also testified that if limited to sedentary work and 15 minutes of sitting and standing, Abbott would be unable to perform work of any kind. (R. at 82.)

The ALJ found that Abbott's "bilateral ulnar impaction syndrome, status post osteotomy on the right; a history of fracture of the right ankle; a history of emphysema; degenerative disc disease of the lumbar spine; degenerative changes of the ankles, right knee, shoulders; osteoporosis; history of fibromyalgia; major depressive disorder; [and] anxiety disorder NOS" were severe impairments. However, the ALJ found that Abbott did not have an impairment or combination of impairments listed in or medically equal to the impairments listed in the regulations. The ALJ found Abbott's allegations concerning the existence, persistence, and intensity of symptoms and limitations were not fully credible. He concluded that Abbott had the residual functional capacity to lift up to 20 pounds maximum and 10 pounds repeatedly; to sit, stand, or walk for up to 1 hour a time each; to sit for up to 6 hours total in an 8-hour; to walk or stand for 4 to 6 hours in an 8-hour work day; to occasionally bend, stoop, squat, kneel, crawl, and climb. He found that she should avoid repetitive pushing and pulling, handling, and work with her arms overhead; that she could not do "very complex-technical work" but she was able to do more than

simple, routine, repetitive work; that her work should not require constant, very close attention to detail; and that she could work with occasional supervision at a regular pace with mild to moderate levels of stress.  The ALJ concluded that these restrictions did not prevent Abbott from performing her past relevant as an electric sealing operator and that jobs existed in significant numbers in the national economy that Abbott could perform.  Accordingly, the ALJ found Abbott was not disabled and not entitled to benefits. (R. at 24-25.)

Abbott appealed the ALJ's decision and the Appeals Council denied her request for review. (R. at 6-14.)  Thereafter, Abbott filed this civil action for review of the decision denying her benefits.  Abbott has moved for summary judgment and the Commissioner has moved for summary affirmance.

## **LEGAL STANDARD**

In order to be entitled to DIB benefits, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled.  See 20 C.F.R. § 404.1505.  Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits.  See 20 C.F.R. § 404.1566.

The establishment of disability under the Act is a two-step process.  First, the plaintiff must be suffering from a medically

determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. § 1382c (a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. See McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. See 20 C.F.R. §§ 404.1520.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. § 404.1521,); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Pt. 404, Subpt. P, App. 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. See Garfield v. Schweiker, 732 F.2d 605, 607 n.2 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on

steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. See Tom v. Heckler, 779 F.2d 1250, 1253 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221, 1225 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. See Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. See Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). An ALJ's credibility determination will not be disturbed unless it is patently wrong. Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

## ANALYSIS

In her motion for summary judgment, Abbott argues (1) that the ALJ improperly discounted the opinion of her treating physician, (2) that the ALJ failed to give appropriate weigh to the opinion of her consultative examining psychologist, and (3) the ALJ failed to properly credit her testimony.

**The ALJ's decision to give Dr. Millar's opinion little weight is supported by substantial evidence.**

The ALJ stated the following regarding Dr. Millar's responses on the May 2002 "Multiple Impairments Questionnaire" :

> The undersigned attributes little weight to the form responses. The degree of limitations indicated are not supported by clinical findings made by the treating family doctor or by the treating orthopedist or by the consultive examiner. Also in a prior questionnaire . . . the treating doctor was given the opportunity to report work related limitations and none were reported.

Dr. Millar's responses to the May 2002 questionnaire indicated that Abbott could lift or carry less than 5 pounds, that she was essentially unable to use her right hand, that she was significantly limited in her ability to use her left hand, and that she was unable to push, pull, kneel, bend, or stoop. Abbott argues these limitations are supported by (1) Millar's clinical assessments of Abbott's diagnosis, (2) Abbott's persistent complaints of pain to Millar, (3) Millar's note that Abbott had multiple trigger points indicative of fibromyalgia, (4) x-rays of Abbott's spine which showed disc disease, and (5) the November 2000 bone density study.

While these clinical findings may support Dr. Millar's opinion as to the existence of Abbott's impairments, they do not necessarily support the degree of impairment suggested by Dr. Millar. While Dr. Millar mentions some of these clinical findings on the May 2002 questionnaire, her treatment notes primarily discuss Abbott's subjective complaints, and there is no indication

14

that Millar ever performed any objective tests to determine Abbott's functional abilities. See Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004) ("medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints").

Moreover, the clinical observations of Dr. Biale, a consulting examining physician, contradict Dr. Millar's suggested limitations.  Less than 6 months prior to Dr. Millar's answers to the May 2002 questionnaire, Dr. Biale observed that Abbott had full range of motion in all of her joints, that her finger grasp and hand grip strength were unimpaired in both hands, and that she had full range of motion in her right wrist.  He also noted that although Abbott had difficulty squatting and performing heel-to-toe walking, she was able to bear full weight and walk normally.  These observations tend to discredit Dr. Millar's opinion that Abbott could not lift more than 5 pounds, that her ability to use her hands was significantly limited, and that she was unable to push, pull, kneel, bend, or stoop.  See Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004) (ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, or when the treating physician's opinion is internally inconsistent, as long as the ALJ minimally articulates reasons for crediting or rejecting evidence of disability). Accordingly, the Court finds the ALJ's decision to discount Dr. Millar's opinion is supported by substantial evidence.

**The ALJ's decision to discount Dr. Witherspoon's opinion is supported by substantial evidence.**

Abbott also argues that the ALJ erred by not giving appropriate weight to the opinion of Dr. Witherspoon, a consulting examining psychologist. After examining Abbott on a single occasion, Dr. Witherspoon recommended that Abbott "be regarded as suffering from both marked medical and psychological difficulties relative to the question of her perceived capacity to seek or sustain employment." The ALJ noted that Dr. Witherspoon's opinion was "not entirely consistent with the clinical findings." In particular, the ALJ noted Dr. Witherspoon's observations that Abbott had fair attention and ability to concentrate; that she was able to subtract serial sevens slowly but accurately; that she was oriented to person, place and time; that her memory was intact; that she was able to recall six digits forward and four backward, with one error multiplying single digits; and that her social judgment was adequate. The Court finds the ALJ was justified in discrediting Dr. Witherspoon's opinion that Abbott suffered from marked psychological difficulties considering these internal inconsistencies in his report, which would suggest Abbott's psychological limitations were not as severe as his opinion suggested. See Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.")

**The ALJ's decision to discredit Abbott's testimony is not**

**patently wrong.**

Abbott argues the ALJ should have accepted her testimony regarding her physical and mental limitations, because it was consistent with the opinions of Dr. Millar and Dr. Witherspoon. At the administrative hearing, Abbott testified that she could not even lift 5 pounds, walk one block, stand for 15 minutes, or sit for more than 15-20 minutes, and that she needed to sit in a reclined position or lie down to relieve her pain. She also testified to difficulties bending, stooping, crawling, kneeling, squatting, climbing, gripping, understanding and remembering things, and handling stress or pressure. As discussed above with regard to the ALJ's decision to discredit the opinions of Dr. Witherspoon and Dr. Millar, these limitations are not consistent with other record evidence. Moreover, Abbott's self reported daily activities belie her assertions that she was so significantly limited. Abbott testified that she lived in an upstairs apartment; that she drove everyday to her daughter's house to supervise her 5-year old grandson; and that she attempted to sew, did laundry, cleaned her house, vacuumed and swept, and went grocery shopping with the aid of her daughter. Consequently, the Court finds the ALJ was not patently wrong in determining Abbott's assertions regarding her own limitations were not entirely credible. Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995) (ALJ's credibility determination will not be disturbed unless it is patently wrong).

**CONCLUSION**

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment [Doc. # 8] is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Affirmance [Doc. # 12] is GRANTED.

CASE TERMINATED.


Entered this  29th  day of March, 2006.


                                        S/Joe Billy McDade
                                        JOE BILLY McDADE
                            United States District Judge